All righty. Hear ye, hear ye, hear ye. This Honorable Appellate Court of the Second District is back in session pursuing to adjournment. The Honorable Susan Faye Hutchinson Presiding. Please be seated. We'll now move to the third case of the morning call. 212-771, The Maryott Group v. Rockford Construction Company, at all. On behalf of the appellant, Mr. Donald Shriver. On behalf of the appellant, Mr. Peter Smith. Okay, again, for the record, although I have seen both counsel in the courtroom when I think I've made the announcement, the third member of our panel is Justice Zinoff. She has taken ill over the last 24-hour period and apologizes for not being here. She will listen to the arguments, and she has submitted some questions via fax that we're also considering. So she will be part of this panel. All right. And Mr. Shriver, when you are ready, you may proceed. Thank you, Your Honor. Good morning. Good morning. I represent Rockford Structures, one of the defendants, and indirectly the DeKalb Building Commission, who we were the general contractor for building a community building in DeKalb, Illinois. The project included hiring as a subcontractor Marriott, who is a plaintiff in this particular action. There are two controlling or overriding factual circumstances that I think need to be emphasized in this particular proceeding. First of all, Marriott admittedly never finished its work under its subcontract and approved change orders. In essence, it abandoned the project at the end. Number two, work that it had performed was performed improperly, and they were paid for that work earlier on in the project. What was the work done improperly? The improper work was that after the project was completed, the parking lot, which was near the building, deteriorated. And as a result, there was substantial testing, which was documented by the exhibits and testimony of not only engineers but the architect. The parking lot had to, based upon the commission and its architect, had to be torn out completely and replaced. Was it strictly because of improper construction, or did it have to do with time lapse and weather issues and things of that nature? Well, it probably, all of those were factors. In fact, the experts testified that all of those factors could have caused the upheaval. But what's critical here, Your Honor, is that when the testing was done to determine what might be the cause, the soil borings turned out to indicate that the stone base, which was part of Marriott's work, and which they had performed almost a year before they abandoned the project, had not met the minimum specifications of being 8 inches in depth. But they had already been paid for that particular work, correct? They were paid for it. However, Rockford structures, the general contractor, pursuant to the requirements that they had to perform properly the entire project, they did hire another contractor then afterwards to tear out and replace that entire parking lot at a cost of just over $50,000. So that included removing the stone base and recoring the surface underneath there, and then replacing the stone base properly, proofrolling it, and then replacing the asphalt on top of it. Now, was any of this work that we're talking about right now, especially with the parking lot underlayment, was any of this part of a change order, or was this part of the original contract? There was the original contract and an immediate change order number one that totaled about $250,000. I don't have the exact numbers on the top of my head, but those two were the initial work that Marriott was to do, including the excavation and the foundation for the building itself, the parking lot, the county road, and the bike paths immediately around that facility. There were four additional approved change orders that had nothing to do with that particular project. And that work was done in the fall of 2007. All right, so let's go back to then your first factual issue, and that is that the Marriott Group abandoned this particular project. And, in fact, we were running up against a time frame. The cement plant was going to close, and we needed to get something done on this project, correct? This was one of the issues. The asphalt plant, yes, they close up as soon as it starts freezing and you're done. And, of course, our timeline as a general contractor required the building to be finished then. All right, when Rockford Construction, or Rockford, pardon me, Structures, gave notice to Marriott that this had to be done, Marriott responded and said, we'll get to it at a certain time. That time wasn't good enough, and then what happened? What happened was, I just want to preface this, please, Your Honor. On August 7, the documents show that Marriott said it had all intentions of finishing the project at that early time. Rockford Structures responded immediately and said, well, get the work done. No work was done. On September 19, about six weeks later, there's another exchange in which Marriott says it can't be on the job site that day. Then there's another about four-week delay until October 16 when Rockford Structures says, can you get the work done? Then what happens, which is a significant day, Your Honor, is October 21. And at that late date, despite having all this time, at least from August 7 on, Marriott throws out a proposed change order of $10,652, I believe, and says, in essence, they're not going to be on the site as promised that next Monday unless that change order is signed by Thursday, they close the business on Thursday, three days before that. So at that point, Marriott said, we're not going to finish the work unless you give us $10,000 more. There was no basis for that. There was no prior communication regarding that. And Rockford Structures had already notified its asphalt layer, we've got to get this done and get the site finished. Then, despite that, because there was all kinds of work that needed to be done, including coring out the rest of the site around the building, replacing the black dirt that had been removed, and maintaining the silt fence, and most critical was the change order number five, which was added to do the Dresser Road bike path. This was a little bit a ways away from where the initial work was done. Marriott didn't do any of it. They didn't do anything. Their only response to any notice was Mr. Bunger, who owns Marriott, said, I came to the site on October 24th, three days after the notice was given to them, saying I got to the site, I was only there about 10 minutes, I didn't talk to anybody, I noticed somebody else was doing our work. And he specifically did not go to the Dresser Road area or anything else to see if any of that work was being done. But what did your client do in response to, if you don't sign this, then we're not going to work, the change order five? What did your client do specifically? They sent the notice of October 21st, saying if you don't do the work in accordance with the contract, we're going to get replacement contractors to do the work. Did they wait two days to get the replacement contractors? The evidence that was presented indicated that NorWest, which was the asphalt contractor, had started to do the work to finish the grading on October 22nd and 23rd. But all of the other work was never contracted for, and in fact, the Dresser Road bike path wasn't even started until October 30th, and spreading the black dirt and all the rest of that started, I think, on November 3rd. But NorWest came in the very next day? They were already there. But they came in to do Marriott's work? To put the asphalt down and put the final grading that they had to do. They found that the work wasn't up to where it was supposed to be and had to do work that Marriott had not finished. They didn't do it of their own volition. They were told by your client, get it done, when he called them. Get that other work done, not just your asphalt. Get the other work done. And that was because Marriott said, we're not coming back unless you give us $10,000. Holding the Rockford structures up and saying, we're done unless you give us $10,500 or $600 more. That's the way it developed. But then Rockford structures, even though when their asphalt contractor got there and found that the work wasn't up to where it was supposed to be and had to finish some of that work, Rockford structures sent three additional notices on the 23rd, the 24th, and the 28th, asking Marriott and pleading with them to finish their other work. And they did not do the work. The only response was that Marriott went to its attorney and the attorney sent a demand letter to Rockford structures. They just left the site. Okay. So now the work that they didn't do after October 21st, they didn't get paid for that, right? No, but that's what they wanted. That's what their claim is. Somebody else did get paid for that. Yes. We hired Bicot and Lawnscapes to do the black dirt spreading and getting the site prepared. And also, NorWest later did the Dressel Road bike path also that had to be done. So did you pay more than, did Rockford structures pay more than they would have paid to Marriott, to these other two companies, or did they pay the same amount? They paid more than twice what was left on the contract. They paid to Including that $10,000 for the Dressel Road bike path that wasn't an accepted part of the contract, correct? No. The Dressel Road bike path was change order number five, which was accepted. That was $12,780, I believe you're on it. And that part was not done by Marriott. It had to be done and was done by NorWest starting at no earlier than October 30th. The other expenses that were incurred by Rockford structures was Bicot for the site grading and the spreading of the black dirt of $9,000. Lawnscapes, which had to prepare the site and maintain the silt fence for $2,527.19. The Dressel Road bike path was $14,135. It had been bid, as I said, at $12,780. And then the other work that, of course, was completed by NorWest, which they state they did some on October 27th. Now this is, you know, well after the first notice that they were $5,209.50. And then according to their invoices, they did work on October 22nd and 23rd at $17,620.30. The total amount, including Rockford structures' additional management administration, they had to have their project manager there longer, ended up to be $63,543.13. That's how much it cost Rockford to finish. That has nothing to do, Your Honor, with the cost that Rockford structures incurred in replacing the parking lot. And as I said on that part of it, which is part of our counter complaint, Wagner Excavating, which is Defendant's Exhibit 28, was $50,462. They had to pay for testing of $2,100 to TSC, and the additional project manager and administration and then supervision on site was $6,625. So Rockford structures, to replace the parking lot, incurred expenses of $59,187. And the total of those two is the evidence that supported our counter complaint for $91,279.32. It's slightly over that amount that we pled for. But the question then is why, when someone from Marriott comes back on the third day after the notice, or would that be the second day? Well, let's say the second day, and somebody's doing their work. Why are they going to do any more work? Why, under that context, are they going to do more work? If anything, only part of their work was being done, and that was the exchange of notices after that on October 23rd, 24th, 28th, saying, please come back, do the work, finish your other work, you know, and whether or not the other issue here, Your Honor, is, is that an appropriate response? If you get a two-day notice pursuant to Section 17 of the contract, and you show up three days later without being mobilized, he said he showed up at 8 o'clock a.m., was there for 10 minutes, talked to no one, and left. Now, is that a response to the contractual obligations you have when you come on as a subcontractor and pursuant to Section 17? Well, the question is, is he still a subcontractor when he gets there and finds out somebody else is doing some of his work? It doesn't matter how much, but the work that he was supposed to do. Is he still a subcontractor? Is he still the valid subcontractor? Without considering, if he shows up on the 24th, and there's no other evidence other than somebody was there doing his work, he breached the contract and he's gone. Because he had two days. His only response was, prior to the first notice, we will not be back on site on the 27th as promised unless you give us $10,000 more. That was his only response at the end of this. And he then did not show up. He didn't do anything. He made no communication. In fact, Gary Dobb, the project manager for Rockford Structure, testified in length how many he made several attempts to have them come back and finish their work. The only response he got was a letter from Marriott's attorney. I don't know where. There's no clock there. It's behind you. But the time has run. You'll have an opportunity to show it. Okay. I'm sorry. Thank you. I don't know why they put the clock so I can see it. There should be one for you as well. Unfortunately, with my age and my eyes, it's kind of hard to see that. Thank you. No problem. All right, Mr. Smith. Justice Hutchinson, Justice Jorgensen, and Justice Zinov. My name is Peter Smith. I am an attorney in Sycamore, Illinois, and I represent Marriott Group in this. I've listened with a great deal of interest to the argument that's been set forth by counsel. And the one thing that I can say in this is that it is extremely fortunate that this is basically a document case. The things that happened, what was said, when it was said, and what was done is all in documents. This is a case that was tried before a judge alone. It's a breach of contract case and a mechanics lien case. And it was tried before Judge Carterman over a period of several months. He heard all of this testimony. He saw all of the documents. And he's the one who made the decision that Marriott had not breached the contract, that Rockford Structures had breached the contract, and that the counterclaim that Rockford Structures brought was not worth anything. He awarded no money on it. What specifically did Judge Carterman say about this demand that we're not coming back unless you sign this change order? Your Honor, there was no such demand made. Do we have an email or a letter or something? We have an email that directly deals with it. And, Your Honor, this is what the email says. We will need to be provided with an executed change order by the end of the day on Thursday in order to be on site Monday as previously discussed. There is nothing within that that says we will not be back. There is nothing within that that says we're not going to do the work if you don't authorize this. And that's in Plaintiff's Exhibit 10. We will need a signed change order by the end of Thursday to be on site Monday. What is that? I mean, I know what it says, but does it say they're going to come anyway? It doesn't say they'll come anyway with regard to what's in the change order. It says that simply we need to be provided with an executed change order by the end of the day on Thursday to be on site Monday as previously discussed. It doesn't say they won't come. Now, to get some background for Your Honor in this, the reason they're requesting an executed change order is because at the beginning of this project, they were asked to go on site and stake the location of various buildings. They believed that they'd be paid for that. They, after they received the contract that they had from Rockford Structures, submitted an amendment to that contract that said the staking will be included. Rockford Structures refused to honor that. They refused to go with the amendment. They said no written contract, no change order, no payment. So your position is that what that email means is we'll be there Monday to do the rest of the work, but we're not doing change order five unless we get a written change order. We're not doing the work included in change order five unless we get a signed agreement. Is that correct? The interesting thing, yes, Your Honor, it is. And the interesting thing about this change order is this change order is to repair damage that had been done to the parking lot during the spring, with the lollies taking the bricks and mortar across, with the trucks that were coming in, and with other things that had occurred in the spring and that had damaged the parking lot. This was for the repair that should have been done for the problems that Rockford Structures complained about in their counterclaim. Rockford Structures refused to do this. Because Rockford Structures refused to do this, they had the problems that they had to pay $50,000 for, and the reason they had to pay it is because they caused it themselves in refusing to have this work done. What about this? I mean, I understand spring weather. I understand heavy equipment going over with other building materials. But how did that affect this gravel underlayment or stone underlayment? What basically happens, and Mr. Bunger testified to this, is when you have the moisture and you have heavy equipment going over it, it pushes the moisture down into the substrata. It creates mush. It causes the stone that's down to be absorbed up, and it disperses it. And what it does is it creates a very uneven substrata. And that's exactly what the borings that were done found. And Mr. Bunger testified that the place where those borings showed little gravel were the places where the lolly was going over it, and the other places where they showed a little gravel were where the trucks had been coming in and out. And so the trial court, in its ruling, did it specifically relate to this testimony, or did it just say, based upon the evidence I've heard? It said broadly based upon the evidence I've heard. There was no specific reference to this. But with regard to that counterclaim, again, the facts that counsel has brought out are not all the facts that were really brought before the court. For instance, the reports of the project engineer and the project architect concerning the failing parking lot do not have any specific cause that they bring in. They simply say it failed and this is what we found. In cross-examination, the project engineer and the project architect acknowledge there was a significant damage due to the depth and installation of the asphalt layer, not the substrata, the asphalt layer. And the damage done in the spring of 2008 due to running vehicles in a lolly over the parking lot, and that was as evidenced in pictures, and that those things could have caused the uneven aggregate depth. Rockford Structures had its own report done by TSC, and that report stated the damage was due to moisture retaining soils under the parking lot, not the installation of the asphalt or the aggregate depth. None of this relates, none of these things are anything that was caused by Marriott. The engineer and architect also acknowledge that the moisture retain of soils and the frost heat could have caused the damage. I've mentioned this before, Mr. Bunker testified that the soil borings in the report that showed depths of 11 inches were in locations on the parking lot where scaffolding was installed and work was being done, and that the borings that showed depths under 8 inches were locations where vehicle and lolly traffic occurred in the spring of 2008. All right, so now after this change order 5 is submitted, we need the signature by Thursday night, we'll be on the site Monday. Were there other things that they could have done on the site had they gone? Yes, and they would have certainly gone forward and completed their work. What was the next document that was generated after this request, or demand as counsel says? The next document, that same day Rockford Structures sends a facsimile rejecting Marriott's proposal for preparation and repair of the parking lot drive and the drive and the bike path and gave, quote, written notice that we will arrange to complete this portion of your work and we'll deduct these costs from your contract, and that's in claims exhibits 11 and 12. Now, this is not a written notice that we will give you two days to do it, or we'll take it over, which is what's required in paragraph 17 of the contract. This says, this is written notice that we will arrange to complete this portion of your work and we'll deduct these costs, and in cross-examination, Mr. Daub for Rockford Structures says this was effective that day, the day that it was given. They are basically terminated from this portion of their work effective that day with that email. And why did they ask, why did Rockford Structures send subsequent emails later in the month of October? You know, I really can't tell you what was going on in Mr. Daub's mind. And the reason I say that is because the same day that he sent this email saying we're going to arrange to have somebody else do it, he called NorWest and he said, we lost our excavator, and he then went on to say that we need to have you come and do that work. And NorWest came the very next day and began doing Marriott Group's work. There was no two days that was given. This is a... Well, according to the testimony, how would your client know that? Because he said he came three days afterwards. They came... When he got there three days later, somebody was doing that work. But how does he know they showed up or that he couldn't do any work? He didn't know that he couldn't do any work, but he did know that he had already been terminated with regard to this work by that email. On October 21st. He got there as soon as he could. And the reason I say that is because this wasn't the only job that they had. They had a number of jobs that they were working on. They pulled off those jobs and they came to this one and showed up. And they were there with their equipment and they were ready to do the work. And they found that their work had been done. Why would they have come prepared to do the work if they thought they were terminated on the 21st? They weren't sure whether they were terminated or not. They came because there had been a demand made that they do the work and they wanted to get the job done. They believed that they still were going to be able to go forward with their contract in some fashion. If they hadn't shown up, if they hadn't done anything, there certainly would be some complaint. But instead they came and they were ready to go as soon as they could. Is there any evidence that Marriott and Rockford structures had worked together before in this record? Not evidence generally, but in this record, so that they knew each other's customs and practices? As far as I know, they had not. This was a first experience for both of them. Now, Mr. Shriver says that he recalls your client, your president, saying, I showed up myself. Did he show up himself or was his equipment already there from previous or were they sitting out on the highway waiting? What was the actual evidence as you recall it? There was already equipment there. And, in fact, the equipment can be seen in some of the pictures that were introduced into evidence. But he showed up and he showed up ready to work and he showed up with his crew. He is the president of the company, but this was a two-person company. He's directly involved in doing the work as well. So the fact that he's the president, he didn't appear in a suit and a tie. He appeared ready to go to work. He was ready to go to work. Yes, he was not wearing Allen Edmonds shoes. All right. So when he got there, he sees somebody working on the parking lot, which was the subject to the change order. What other work could he have done? Change order five. So if they were working on the parking lot, what other work could he have done? Your Honor, as I recall, there was a change order with regard to the bike path. That was the dresser roll bike path? Yes. And there was some bike path work that was already part of the original contract. There was additional work that was to be coming because of that change order. And he found that there had been work already done with regard to that as well. Did he have in this contract obligation to do the dirt around the foundations and things of this nature? Yes, he has to do the final grading. Okay. That's what it would be called in the industry. I say dirt around the foundation. I say dirt around the foundation, too. Okay. Your Honor, the bottom line to all of this discussion is the standard appeal is whether the evidence is so contrary to the decision that was made that it should be remanded. And that is simply not the case in this situation. Not the case with regard to the breach of contract. Not the case with regard to the counterclaim. And, you know, there was comment made with regard to not finishing the work. When there has been a breach by Rockford Structures, and the notice provision of two days is a significant provision and a material part of the contract. And when that has been breached, there is no obligation for Marriott to continue to work. In fact, there has been a material breach by Rockford Structures. And with the work already done, what is Marriott really supposed to do except contact their attorney? So what is the amount that your client is owed? Your Honor, the amount that my client is owed, if we take it as I've calculated it. We became lawyers because we were really bad with math and calculators, but let's try it again. Okay. Your Honor, first of all, there was work that had been done and there was a holdback. And this holdback had been there for many months. The amount of the holdback is the difference between the amount paid and the amount invoiced, and it's $16,741.61. There was work that was accepted, and this is basically change order five, and not performed. And the amount of that change order was $12,780. But the cost for materials and labor was $5,345.73. And that is really an all-inclusive amount. That's not on the stone, but the equipment, the people, and the cost lay it down. And pages R175 and 176 of the record contain Mr. Bunker's testimony with regard to that. It wasn't challenged. And so the net amount for lost work performed would be $7,433.83. Now, the total on those two would come to $24,175.44. Now, that's as was proven. The trial judge in this simply awarded the amount that was pled within the amended complaint. He also awarded interest because this is a written contract, and within the written contract, it's basically a liquidated amount. The interest that the trial judge awarded was $3,752.47. But if you use the calculation of what was actually proven, as opposed to the $20,000 and some change that he used for his amount, that pretrial interest would be $4,380.60. There's also a claim that we have with regard to quantum merit. And I rely on the brief concerning that. The amount that should have been paid in quantum merit for that staking that was done way back in the beginning on this was $4,350. And that's not part of the holdback amount? And that's not part of the holdback. And that is a separate matter entirely. And then finally, there's the issue of attorney's fees. And that is a matter of first impression. It's a matter of principle and not precedent. And I would ask the court to seriously consider it, and I would rely on the brief in that. I know that I'm over my time here. Actually, I'm kind of interested in the attorney's fees. Why are you entitled to fees? Pardon me, Your Honor? Why are you entitled to fees? Why am I asking for fees? Your Honor, the Mechanics Lien Act indicates that where there has been a failure to pay without cause, attorney's fees may be awarded. And the trial judge in this found that the county had failed to pay without cause. The attorney's fees go with the owner of the property. And when the judge made that finding, but refused to award attorney's fees because, as he said, they had been bargained away in the contract and were not allowed in the contract, I believe he made an error first in fact, but also in law. The error in fact is that the contract in some way prohibited Mechanics Lien attorney's fees. It did not. If there had not been a Mechanics Lien involved here, you wouldn't probably be making this argument, correct? That's correct, Your Honor. So you're basing it not on the contract, but on the Mechanics Lien Law. Yeah. The fee-shifting clause that they had within the contract was one-sided, of course. It went with the contractor and not with the sub. But it didn't prohibit anything with regard to the Mechanics Lien Act. That was not bargained away. You said it was error in fact and error in law? I would say it's an error in fact and an error in law. The same issue? Same issue. Okay. I see. Okay. All right. Thank you, Counsel. Thank you, Your Honor. Mr. Shriver. Thank you. The requested additional change order at the last minute as claimed for damage to the site. That was already taken care of. As Mr. Smith had indicated, it was determined in spring. Change Order 3 indicates that additional stone and so forth was authorized to them. It was done and paid for. And there was no other complaints made after that, after the contractor did the work for Change Order 3. And, in fact, that's the last time, as far as I know, that they were on the site. Number two, as far as the notice is concerned, there's no form described in the contract in Section 17. The notice does not have any particular form. It's merely, if you don't get back to work, we're going to get somebody else to do the work. And doesn't the contract that's Paragraph 17 allow Marriott or whoever is your subcontractor two days to get back to work? But he never did. It does, I agree with Your Honor on that point. Then why did your client get in touch? They knew Northwest was going to be there because of paving, I get that part, or asphalting. But why then to say, well, I lost my excavator, so you've got to go in and do this other shift, too? Well, for two reasons. It had to get done, and it was not known until Northwest got there to do their asphalt work that the work had not been completed. And number two, Marriott said, we're not coming back next Monday, the following Monday, if you don't give us more money. There was those two reasons. So Northwest was there, they had to get the work done, so they started finalizing the surface. The claim that it had other jobs is bogus. It had over two and a half months. I've already referenced the August 7th time period when they were being asked to get back and finish their work. They had over two and a half months, and they never showed up. But by the same token, couldn't your client at any time during those two months have terminated their contract with Marriott and had someone else do the work? Yes, ma'am, but it's very expensive to come in and then have to hire other people. It's time consuming. You want to work with your subcontractor, come and get the work done, please. That's what they asked. And they kept asking that even after Northwest was on the site, come and finish your work, your other work. They never did. There was no intention of finishing it because immediately they go to the site, they never communicate again, and then they had their attorney send a letter. That's the sequence that happened, and the documents are in the plaintiff's exhibit. Did the lawyer send the letter before your client's communications on, I think you said the 27th or 28th, come back, when are you going to come back? Did you get that letter first? No, I believe the lawyer's letter was dated October 31st, three days later. That was the first response to the October 28th notice. And when you said, please come back, please come back, what were they to do? If Northwest was working on the parking lot, what were they supposed to do? They were supposed to do the Dresser Road bike path. They were supposed to core the remaining site. They were supposed to spread the black dirt so the landscaper could see it. And there was, I think the silt fence, they had to continue to maintain that, you know, little things, too. He never brought the crew on that Friday when he came. His testimony was, well, I was going to have the crew come later at 10 o'clock. That was his only testimony. And he's hired. I mean, counsel said that the company is two primaries, and then they hire other people to do other things, or you don't know how they do it. Except from his testimony, I didn't have anybody come. They were going to come later. Then the critical thing here, Your Honor, is that the court just picked a number out of the air, even awarding damages from the verified complaint, and then used two different numbers. One verbal order was for $16,000, and then the judge went to $20,000 and said, well, they're entitled to the benefit of their bargain. That's not the law. The law is lost profits. If you're prevented from finishing your job and you substantially completed, you are entitled to lost profits. Whose burden is the lost profits? The plaintiff. It has to be proved by reasonable certainty. It can't be speculative, and it can't be based on false assumptions. That's what the law says. Now, the plaintiff tried to even prove just the stone, cost of the stone, and in its final, it submitted a summary, Plaintiff's 26 at the time, a trial, and withdrew it. It had a summary of damages at the close of the plaintiff's case. It had a summary of damages at the close of all the cases, and they were all different. They were picking and choosing, and they were attempting to show the court $60,000 worth of damages. They were trying to get money for change order two, which says it was not $27,000. It was a maximum, and change order three clearly says you get $2,500 for the black dirt you moved. They made every attempt. Now, the court did not even talk about lost profits. And then, even if there is lost profits and there's some attempt by the plaintiff to show that the cost of stone, they didn't even take the cost of the stone from the stipulation that they introduced into evidence regarding Norwest's work on the 22nd and the 23rd and that. They ignored those numbers. Those numbers totaled $7,900 in and of itself. That had to be a cost of completing and not part of their profit. So there was never any adjustment even by the plaintiff to conform to the lost profits, and the court totally ignored anything and picked two numbers. First off, the summary sheet of $16,000, and then later on, picking the number from the complaint, the original complaint. So the court failed in its job to even assess the damages in accordance. The interest and the attorney's fees, this is a public lien. They're not entitled to it. The interest was based upon the interest statute, and that was not proper either. According to that, you have to have an instrument that, like a note or something like that, that has clear designation of what is owed to get the interest if the court, you know, fines for the plaintiff. You can't use a lost profits damage standard and say that that has any degree of certainty because it requires an extensive amount of approval for the plaintiff to fail to do in this case. Thank you very much for your time. One other question. Why should we not impose attorney's fees on the mechanic's lien theory? Under the law, the public, it really falls back on the public owner in this type of case. And in the mechanic's lien statute, under private projects, there is a provision for attorney's fees and interest in a private project. In the public part of the mechanic's lien act, the courts have said, though, that provision does not apply. It only applies to the private. So there's nothing to do with the contract. What's that? Your position has nothing to do with the contract. In the contract, Your Honor, there is no provision for attorney's fees for the subcontractor. There is for the contractor. Okay, I got that part. So your position is not that fees were not properly denied based on the contract but based on the statute. Is that correct? Yes, and there's nothing in the contract that allows the subcontractor to get attorney's fees. That would have to be specifically stated and was not bargained for. Got it. Thank you. Thank you very much. A decision will be made in due course. Thank you for your arguments this morning, and we will again stand in recess.